FILED BY _____ D.C.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE 05 OCT 26  AM 6: 38
WESTERN DIVISION

THOMAS M. GOULD
CLERK, U.S. DISTRICT COURT
W/D OF TN, MEMPHIS

ANA PATRICIA CHAVEZ,           )
CECILIA SANTOS,                )
JOSE FRANCISCO CALDERON,       )
ERLINDA REVELO, and DANIEL     )
ALVARADO,                      )
                               )
            Plaintiffs,        )
                               )
v.                             )        No. 03-2932 Ml/P
                               )
NICOLAS CARRANZA,              )
                               )
            Defendant.         )

---

## ORDER DENYING IN PART AND GRANTING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

---

Before this Court is Plaintiffs' Motion for Summary
Judgment, filed June 24, 2005.  Defendant responded in opposition
on July 27, 2005, and Plaintiffs filed a reply on October 13,
2005.  For the reasons set forth below, Plaintiffs' motion is
GRANTED in part and DENIED in part.

### I.  Background and Relevant History

Plaintiffs, who are or were at all pertinent times citizens
of El Salvador, filed their original complaint in this action
pursuant to the Torture Victims Protection Act ("TVPA"), Pub. L.
No. 102-256, 106 Stat. 73 (enacted March 12, 1992)(codified as
Note to 28 U.S.C. § 1350), and the Alien Tort Claims Act
("ATCA"), 28 U.S.C. § 1350, on December 10, 2003.  Plaintiffs

-1-



filed an Amended Complaint on July 29, 2004, and a Second Amended Complaint on June 20, 2005.  On September 30, 2004, the Court denied Defendant's motion to dismiss and renewed motion to dismiss, and on October 18, 2005, it denied Defendant's motion for judgment on the pleadings, or in the alternative, for summary judgment.

According to Plaintiffs, Defendant, Nicolas Carranza, served as El Salvador's Subsecretary of Defense and Public Security, from about October, 1979, until January, 1981, during which time he "exercised command and control over the three units of the Salvadoran Security Forces—the Guardia Nacional ('National Guard'), Policia Nacional ('National Police'), and Policia de Hacienda ('Treasury Police')." (Second Am. Compl. ¶¶ 2-3.)  He served as Director of the Treasury Police from about June, 1983, until May, 1984, during which time he "possessed and exercised command and control over the Treasury Police." (Id. ¶ 3.) Plaintiffs' Second Amended Complaint alleges that Mr. Carranza "exercised command responsibility over, conspired with, or aided and abetted subordinates in the Security Forces of El Salvador, or persons or groups acting in coordination with the Security Forces or under their control, to commit acts of extrajudicial killing, torture, and crimes against humanity, and to cover up these abuses." (Second Am. Compl. ¶ 2.) Defendant has resided in the United States since 1984 and is currently a resident of

-2-

Memphis, Tennessee.

Plaintiffs claim that Defendant bears command responsibility for certain predicate acts—namely, the torture, extrajudicial killing, and crimes against humanity that Plaintiffs and their family members have allegedly suffered. (Pls.' Mot. Summ. J., at 1.)  The doctrine of command responsibility requires that Plaintiffs prove (1) the occurrence of each predicate act and (2) that Defendant is liable as the commander of those who perpetrated the acts.  (Id. at 1-2.)  Plaintiffs seek summary judgment on the predicate acts of torture and extrajudicial killing under the TVPA and the ATCA.  They argue that there is "overwhelming evidence in the record" to support these claims. In addition, by granting summary judgment, "the Court will narrow the complex body of facts and law that the jury will be required to consider at trial and thereby promote trial efficiency." (Id. at 1.)

## II. Undisputed Facts

The facts underlying Plaintiffs' claims are largely undisputed.  Plaintiff Ana Maria Chavez ("Chavez") is a citizen of El Salvador, a legal permanent resident of the United States and a current resident of California.  (Second Am. Compl. ¶ 8.) On July 26, 1980, Chavez, her partner, Carlos Omar Reyes, and her infant daughter were at Chavez's parents' home in El Salvador for a visit.  Her parents, Guillermina and Humberto Chavez, were

school teachers and members of the teachers' union in Ahuachapan, El Salvador. That morning, Chavez saw "in the corridor of the house a man dressed in civilian clothes, wearing a mask, and carrying a rifle." This individual grabbed Chavez's mother and threw her on the bed. More armed men, dressed similarly, entered the house. One threw Chavez on the bed next to her mother. The men beat Chavez's mother, and opened "all the drawers in the bedroom wardrobe, and demanded to see propaganda and money." Chavez and her infant daughter were taken to another room, where Chavez could hear her mother's continued beating, and then gunshots. Once it was quiet, Chavez left the room and found that her mother had been killed. She subsequently found her partner at the neighbor's house and her father in the corridor of her parents' home. Both had been shot. (Def.'s Resp. Pls.' Statement Mat. Facts ("Def.'s Resp. Pls.' SOMF") ¶¶ 2-11.)

Cecilia Santos ("Santos") is a native of El Salvador, a naturalized citizen of the United States, and a resident of New York. (Second Am. Compl. ¶ 9.) According to the undisputed facts, Santos was a student at the National University of El Salvador and worked full-time for the Salvadoran Ministry of Education in 1980. On September 25, 1980, Santos was in the restroom at a shopping mall in San Salvador when she heard a loud noise that sounded like an explosion. Two private security guards entered the restroom and began questioning Santos about

the sound.  They subsequently took Santos to an office in the
mall and "accused her of having planted a bomb, offering what
appeared to be a box of cigarettes as proof."  An individual in
the office made a telephone call, and thirty minutes later, "two
men dressed in civilian clothes came to the office and took Ms.
Santos away in a taxi."  (Def.'s Resp. Pls.' SOMF ¶¶ 16-22.)

     After driving for approximately twenty minutes, they reached
the headquarters of the National Police, whereupon Santos was
"turned over to the Corporation of National Investigation," a
subsection of the National Police agency.  Santos was
blindfolded, led through a tunnel, and "crossed a larger room
where she heard the sounds of many people moaning and groaning on
the floor."  Santos was seated in a room with several men in it
and was told, "[i]t will be easy if you cooperate with us."  One
of the men interrogated Santos, asking her about her family
members, co-workers and classmates.  Another "groped her by
pressing on her breasts and legs, and trying to put his hand
inside her blouse and skirt[;] later . . . one of her
interrogators pulled her partially out of the chair and forced an
object into her vagina."  Santos screamed in pain, to which one
of the men replied, "[t]hat's nothing.  That's just to test."
Another said, "[d]o you remember where you are?  This is the
National Police Headquarters, and here we decide what is going
on, what can . . . happen to you."  An interrogator inquired

whether Santos knew how to make a bomb and told her that she had
to know, since she was in the University.  "The man dipped a Q-
Tip into a bottle of sulphuric acid and inserted it into Ms.
Santos' nose.  He also dropped acid onto Ms. Santos' right hand,
which caused it to blister almost immediately."  Later, "while
one man monitored her heart rate with a stethoscope, another man
attached wires around the fingers of Ms. Santos' right hand and
administered electric shocks."  (Def.'s Resp. Pls.' SOMF ¶¶
23-37.)

During the interrogation, the men placed pictures of
different individuals before Santos and asked her to identify
them.  She later signed a blank piece of paper, "with the
assistance of one of her interrogators."  After her interrogation
ended, one of the men who had been questioning her took her "to a
man in a green uniform, who was to place her in a cell."  Her
interrogator instructed the man that Santos "is in the deposit of
the Ministry of Defense."  (Def.'s Resp. Pls.' SOMF ¶¶ 38-41.)

Plaintiff Jose Francisco Calderon ("Calderon") is a native
of El Salvador, a naturalized citizen of the United States, and a
resident of California.  (Second Am. Compl. ¶ 10.)  According to
Plaintiffs' undisputed statement of facts, Calderon's father
("Paco") was a school principal and, like Chavez's parents, a
member of the teachers' union in Ahuachapan, El Salvador.  In
June 1980, Calderon's father was arrested for possession of

-6-

flyers that "instructed the population about what to do in the event of a general strike or a natural disaster." Calderon testified that "when you have one of those flyers, the army sees you as a subversive." (Calderon Dep., Pls.' Mem. Supp. Mot. Summ. J. Ex. E at 18.) Upon his release, Plaintiff Calderon's father moved in with Calderon in San Salvador. On September 11, 1980, uniformed members of the National Police wearing bulletproof vests came to Calderon's house and demanded entry. Calderon opened the door, and "several men in civilian clothes entered the house." One of the men, "was wearing a mask and carried a G3 military-issued rifle," forced Calderon on the floor, stepped on him and pointed the rifle at his back. The men also detained Calderon's father, at which point they "broke the light bulbs in the living room, then fired five gunshots from the G3 rifles into Paco Calderon's body." Calderon "thought that he would be shot next," but the men left. (Def.'s Resp. Pls.' SOMF ¶¶ 42-55.)

Plaintiff Erlinda Revelo,("Revelo")[1] is a citizen and current resident of El Salvador. (Second Am. Compl. ¶ 11.) According to Plaintiffs,[2] Revelo's husband, Manuel Franco, was a

---

[1] Revelo originally brought her claims under a pseudonym, Jane Doe. Her husband's pseudonym was James Doe. The Court granted Plaintiffs' Unopposed Motion Regarding Use of Pseudonyms and to Unseal Documents Filed Under Seal on September 19, 2005.

[2] Plaintiffs rely largely on the findings of fact set forth in the Report of the United Nations Truth Commission on El Salvador ("Truth Commission Report" or "Report"), dated April 1, 1993. The Truth

professor at the National University in El Salvador and a prominent leader of the Democratic Revolutionary Front (FDR) in 1980. On November 27, 1980, Revelo's husband and five other FDR leaders were abducted "in a military operation in which the perimeter of the school was secured by the Treasury Police." Franco's body was later dumped on the side of the road on the outskirts of Apulo, El Salvador. When Revelo identified her husband's body, she observed gunshot wounds to her husband's mouth and thorax, as well as "a well-defined burn surrounding his entire neck." (Def.'s Resp. Pls.' SOMF ¶¶ 56-63.)

Plaintiff Daniel Alvarado ("Alvarado")[3] is a native of El Salvador, is not a United States citizen, and has resided in Sweden since 1986. (Second Am. Compl. ¶ 12; Pls.' Resp. Def.'s SOMF ¶ 4.) Alvarado was abducted in August 1983 by men dressed in civilian clothes and carrying military-issued rifles. He was taken to the Treasury Police headquarters, and placed in a cell. The men connected wires to Alvarado's toes and ran an electric current through his body. They also placed a hood over his head and beat him. The men accused Alvarado "of being a guerrilla fighter" and that he was responsible for the death of Lt. Cmdr.

---

Commission on El Salvador was charged with investigating acts of violence that took place during the country's civil war from 1980 to 1991. (See Truth Comm'n Report, Pls.' Mem. Supp. Mot. Summ. J. Ex. B ("Truth Comm'n Report") at PL0009.)

[3] Alvarado originally brought his claims under a pseudonym, John Doe. See supra n.1.

-8-

Albert Schaufelberger, a United States military advisor in El Salvador.  Alvarado alleges that the individual in charge was Major Ricardo Pozo, the chief of the intelligence section of the Treasury Police and the head of the official Salvadoran investigation into Lt. Cmdr. Schaufelberger's death.  Pozo told Alvarado "that his cooperation was necessary because there was a reward for finding the perpetrator of the Schaufelberger assassination, and that Maj. Pozo wanted to give the reward to 'his boys,' Mr. Alvarado's torturers."  Alvarado was tortured over the course of four days, after which point he "could not withstand further torture, and he signed a statement, which he did not read, and which he later discovered attributed to him responsibility for the Schaufelberger murder."  Alvarado was subsequently taken to a media event at the Treasury Police headquarters—at which Defendant presided—and was forced to say that he killed Lt. Cmdr. Schaufelberger.  Upon return to his cell, Alvarado was once again tortured with electric shocks, causing him to suffer a nervous breakdown.  Alvarado was transferred to another cell within "the more public part" of the Treasury Police headquarters eighteen days later.  Several weeks later, he was questioned by two representatives from the United States and was given a polygraph exam, which confirmed Alvarado "had been tortured and that he did not participate in the Schaufelberger assassination."  (Def.'s Resp. Pls.' SOMF ¶¶

-9-

64-88.)

## III.  Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  So long as the movant has met its initial burden of "demonstrat[ing] the absence of a genuine issue of material fact," Celotex, 477 U.S. at 323, and the nonmoving party is unable to make such a showing, summary judgment is appropriate. Emmons v. McLaughlin, 874 F.2d 351, 353 (6th Cir. 1989).  In considering a motion for summary judgment, "the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When confronted with a properly-supported motion for summary judgment, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); see also Abeita v. TransAmerica Mailings, Inc., 159 F.3d 246, 250 (6th Cir. 1998).  A genuine issue of material fact

exists for trial "if the evidence [presented by the nonmoving party] is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In essence, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

## IV.  Analysis

Plaintiffs allege that Defendant is liable under a theory of command responsibility for acts of torture, extrajudicial killing, and crimes against humanity that were perpetrated against Plaintiffs and/or their family members.  They seek summary judgment on several of these predicate acts: (1) Chavez's claims of torture and extrajudicial killing under the ATCA and the TVPA; (2) Santos's claim of torture under the TVPA; (3) Calderon's claims of torture and extrajudicial killing under the TVPA; (4) Revelo's claim of extrajudicial killing under the ATCA and the TVPA; and (5) Alvarado's claim of torture under the ATCA and the TVPA.  (Pls.' Mot. Summ. J. 2.)

Defendant argues broadly that "Plaintiffs' case and claims are tendered by reliance upon hearsay, double-hearsay, triple-hearsay, irrelevance, denial of due process and all of the other objections" Defendant has set forth in earlier submissions to the Court.  (Def.'s Mem. Opp. 1.)  In particular, Defendant

-11-

challenges Plaintiffs' reliance on the Truth Commission Report.
He also claims that he "cannot even investigate the truthfulness
of the allegations or find witnesses as to the alleged incidents
to which he was not present or aware." (Id. at 2.)  With the
exception of the facts taken from the Truth Commission Report,
Defendant does not dispute the facts that underlie Plaintiffs'
claims of torture and extrajudicial killing.  (See Def.'s Resp.
Pls.' SOMF.)[4]

### A. Applicable Law

The Alien Tort Claims Act states that "[t]he district courts
shall have original jurisdiction of any civil action by an alien
for a tort only, committed in violation of the law of nations or
a treaty of the United States." 28 U.S.C. § 1350.[5]  The Supreme
Court recently interpreted the ATCA in Sosa v. Alvarez-Machain,
542 U.S. 692, 124 S.Ct. 2739 (2004).  Sosa held that the ATCA is
a "jurisdictional statute creating no new causes of action" but
that the grant of jurisdiction was "enacted on the understanding
that the common law would provide a cause of action for the

---

[4] Defendant also argues repeatedly that Plaintiffs cannot prove a
"causal connection" between the acts complained of and Defendant's
knowledge or involvement.  As Plaintiffs' motion does not seek summary
judgment on any aspect of Defendant's liability under the theory of
command responsibility, however, the Court will not address this
argument.

[5] Courts sometimes refer to this statute as the "Alien Tort
Statute" or the "Alien Tort Act." See, e.g., Sosa v. Alvarez-Machain,
542 U.S. 692, 124 S.Ct. 2739 (2004);  Kadic v. Karadzic, 70 F.3d 232
(2d Cir. 1995).

modest number of international law violations with a potential for personal liability at the time [of its enactment]." 124 S.Ct. at 2761. The Court did not specify which violations of international law norms are actionable under the ATCA, but courts have since construed <u>Sosa</u> to permit claims of torture and extrajudicial killing to go forward under the ATCA. <u>See</u>, <u>e.g.</u>, <u>Aldana v. Del Monte Fresh Produce, N.A., Inc.</u>, 416 F.3d 1242, 1251 (11th Cir. 2005)(holding plaintiffs "can raise separate claims for state-sponsored torture under the [ATCA] and also under the [TVPA]); <u>Mujica v. Occidental Petroleum Corp.</u>, 381 F.Supp.2d 1164, 1179 (C.D. Cal. 2005)(recognizing claims of torture and extrajudicial killing under ATCA); <u>Doe v. Saravia</u>, 348 F.Supp.2d 1112, 1144-45 (E.D. Cal. 2004)(recognizing claim of extrajudicial killing under ATCA and TVPA); <u>but see</u> <u>Enahoro v. Abubakar</u>, 408 F.3d 877, 885 (7th Cir. 2005)(construing <u>Sosa</u> to limit relief against torture and extrajudicial killing to the TVPA and dismissing plaintiffs' torture claim brought solely under ATCA).

The Torture Victim Protection Act provides that:

> [a]n individual who, under actual or apparent authority, or color of law, of any foreign nation . . . (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

-13-

28 U.S.C. § 1350 note.  The TVPA provides an "unambiguous and modern basis for a cause of action" for torture and extrajudicial killing.  H.R. Rep. No. 102-367(II), reprinted in 1992 U.S.C.C.A.N. at 86.  Unlike the ATCA, both citizens and non-citizens of the United States may file claims under the TVPA.  See Saravia, 348 F.Supp.2d at 1145.

**B.  Torture**

To prove a claim of torture under either the ATCA or the TVPA, each Plaintiff must first establish that governmental actors carried out the alleged torture to which they were subjected.  See 28 U.S.C. § 1350 note § 2(a)("An individual who, under actual or apparent authority, or color of law, of any foreign nation . . . subjects an individual to torture shall . . . be liable . . . ."); H.R. Rep. No. 102-367(III), reprinted in 1992 U.S.C.C.A.N. at 87 (noting that suits against "purely private groups" are not actionable under the TVPA and that "the plaintiff must establish some governmental involvement in the torture to prove a claim"); Aldana, 416 F.3d at 1247 (recognizing state action as necessary element of torture under the ATCA); Kadic, 70 F.3d at 243-44 (holding torture actionable under the ATCA "only when committed by state officials or under color of law").  When persons who are not government officials "act[] together with state officials" or act with "significant state aid[,]" they are deemed governmental actors for the purposes of

-14-

the state action requirement under the TVPA and the ATCA.

Saravia, 348 F.Supp.2d at 1145 (noting courts look to the

jurisprudence of 42. U.S.C. § 1983 "as a guide to determine when

persons who are not themselves government officials, nonetheless

act under apparent authority or color of law").

The TVPA defines torture as any act (1) "directed against an

individual in the offender's custody or physical control[;]" (2)

that inflicts "severe pain or suffering[,] . . . whether physical

or mental[;]" (3) for the purpose of obtaining information,

intimidation, punishment or discrimination.  28 U.S.C. § 1350

note § 3(b)(1).  The ATCA does not define torture.  Courts

analyzing ATCA torture claims generally rely on the definition

set forth in the Convention Against Torture and Other Cruel,

Inhuman or Degrading Treatment or Punishment ("CAT"), which is

substantially the same as the TVPA definition.[6]  See Aldana, 416

---

[6] The Convention defines torture as:

> any act by which severe pain and suffering, whether
> physical or mental, is intentionally inflicted on a
> person for such purposes as obtaining from him or a
> third person information or a confession, punishing him
> for an act he or a third person has committed, or
> intimidating or coercing him or a third person, or for
> any reason based on discrimination of any kind, when
> such pain or suffering is inflicted by or at the
> instigation of or with the consent or acquiescence of a
> public official or other person acting in an official
> capacity.  It does not include pain or suffering arising
> only from, inherent in or incidental to lawful
> sanctions.

Part I, Article I, G.A. Res. 39/46, U.N. GAOR, Supp. No. 51,
U.N. Doc. A/39/51 (1984).

F.3d at 1251 (relying on CAT definition of torture to evaluate ATCA claim); see also Presbyterian Church of Sudan v. Talisman Energy, Inc., 244 F.Supp.2d 289, 326 (S.D.N.Y. 2003); Kadic, 70 F.3d at 243-44.

### 1. Chavez

As set forth above, each Plaintiff must first establish that governmental actors were involved to make out a claim of torture under the ATCA and the TVPA. See 28 U.S.C. § 1350 note § 2; H.R. Rep. No. 102-367(III), reprinted in 1992 U.S.C.C.A.N. at 87; Aldana, 416 F.3d at 1247; Kadic, 70 F.3d at 243-44.

Under this standard, a triable issue of material fact exists as to whether government actors were involved in Chavez's alleged torture.  The undisputed fact show that masked men——dressed in civilian clothes, carrying rifles, and demanding propaganda and money——carried out the attack on Chavez's family. (Def.'s Resp. Pls.' SOMF ¶¶ 2-6.)  Chavez characterizes this group of men as members of a "death squad" working in cooperation with the government to carry out attacks on civilians, citing the Truth Commission Report, which states that Salvadoran armed forces "operated on the death squad model" and that operations were carried out by "members of the armed forces, usually wearing civilian clothing, without insignias, and driving unmarked vehicles."  (Truth Comm'n Report at PL0161, PL0166) ("The members of such groups usually wore civilian clothing, were heavily

-16-

armed, operated clandestinely and hid their affiliation and
identity.  They abducted members of the civilian population . . .
.")  Defendant, however, argues that Plaintiffs simply
presume—without proof—that the men who killed Chavez's parents
were members of government-affiliated death squads.  (Def.'s Mem.
Opp. Pls.' Mot. Partial Summ. J. at 2.)

     The Court agrees that, in order to find the requisite state
involvement in Chavez's claims, the Court would have to infer
from the fact that government-sponsored death squads operated in
El Salvador during this period that the men who killed Chavez's
parents must have been members of death squads.  On a motion for
summary judgment, however, the Court must draw all inferences in
the nonmovant's favor.  <u>Kochins v. Linden-Alimak, Inc.</u>, 799 F.2d
1128, 1133 (6th Cir. 1986)("A summary judgment movant bears the
burden of clearly and convincingly establishing the nonexistence
of any genuine issue of material fact, and the evidence as well
as all inferences drawn therefrom must be read in a light most
favorable to the party opposing the motion.")  Accordingly, the
Court finds that Chavez has failed to demonstrate the absence of
a genuine issue of material fact on the issue of state
involvement.  <u>Cf.</u> <u>Aldana</u>, 416 F.3d at 1248-49 (granting
defendants' motion to dismiss torture claim under ACTA and TVPA
where plaintiffs' allegation that police knew of and deliberately
ignored private security force attack on civilians was based

-17-

solely on the fact that the police station was nearby).  The
Court DENIES Chavez's motion for summary judgment as to the
predicate act of torture under the ATCA and the TVPA.

### 2. Santos

Plaintiff Cecilia Santos alleges that she was subject to
torture under the TVPA.  The undisputed facts demonstrate that
Santos suffered severe pain and suffering—she was sexually
assaulted, given electric shocks, and burned with acid while in
the custody of the Salvadoran National Police.  (Def.'s Resp.
Pls.' SOMF ¶¶ 28-29, 34-35, 37); see Doe v. Qi, 349 F.Supp.2d
1258, 1317 (N.D. Cal. 2004)(finding "use of particularly heinous
acts such as electrical shock or other weapons or methods
designed to inflict agony does constitute torture").  Santos was
tortured for the purpose of "obtaining information, intimidation,
punishment or discrimination," 28 U.S.C. § 1350 note § 3(b), as
evidenced by the fact that she was accused of having planted a
bomb and asked to identify people in several pictures (Def.'s
Resp. Pls.' SOMF ¶¶ 20, 32-33, 38).  Finally, Santos has
established government involvement in her torture.  She claims
that she was in the custody of officials from the Corporation of
National Investigation ("CAIN"), a subsection of the Salvadoran
National Police,[7] and was repeatedly told that she was in the

---

[7] Defendant admits this statement, as per Santos' testimony, but
notes that he was "not familiar with the National Police and did not
know the name 'CAIN' and whether it was a proper name."  (Id. ¶ 25.)

-18-

National Police headquarters.  After her torture and interrogation had concluded, one of her interrogators told a "man in a green uniform" that Santos was "in the deposit of the Ministry of Defense."  (Id. ¶¶ 23-25, 31, 36, 41.)  The undisputed facts plainly indicate that Santos was subjected to severe pain and suffering by individuals acting under color of law for the purpose of obtaining information, intimidation, or punishment.  Accordingly, the Court GRANTS Santos' motion for summary judgment as to her predicate act claim that she was tortured under the TVPA.

### 3.  Calderon

Plaintiff Calderon alleges that he was subjected to severe pain and suffering by being forced to witness the death of his father and by being threatened with imminent death.  The TVPA defines "mental pain or suffering" as:

> prolonged mental harm caused by or resulting from .
> . . (C) the threat of imminent death; or
> (D) the threat that another individual will
> imminently be subjected to death, severe physical
> pain or suffering, or the administration or
> application of mind altering substances or other
> procedures calculated to disrupt profoundly the
> senses or personality.

28 U.S.C. § 1350 note § 3(b)(2).  The undisputed facts show that Calderon's attackers forced him to the ground, stepped on him, and pointed a rifle at his back.  After the men shot his father, Calderon thought he would be shot next.  (Def.'s Resp. Pls.' SOMF ¶¶ 49-55); see Qi, 349 F.Supp.2d at 1318 (finding plaintiff

-19-

subjected to mental torture under TVPA where forced to "witness
the guards' severe mistreatment of a close friend"); <u>Aldana</u>, 416
F.3d at 1251-52 (finding threats of imminent death to constitute
severe mental suffering under both ATCA and TVPA).

Calderon has also established the requirement of state
action.  He observed "uniformed members of the National Police
wearing bulletproof vests" outside his house who demanded that he
open the door.  One of the men carried a "G3 military-issued
rifle." (Def.'s Resp. Pls.' SOMF¶¶ 46-55; <u>see also</u> Truth Comm'n
Report at PL0263 ("G3 rifles were the regulation weapon of the
security forces at the time and were used by the armed forces of
El Salvador in the war against Honduras in 1969."))

Finally, Calderon has demonstrated that the men who carried
out the attack and killed his father acted with the purpose of
obtaining information, intimidation, punishment, or
discrimination.  Plaintiffs claim that Calderon was tortured in
order to punish him for his father's "presumed political beliefs
and ideology," and they assert that Calderon's father's arrest
approximately three months earlier—for possession of allegedly
"subversive" flyers—was the motivation behind the killing.
(Mem. Support Pls.' Mot. Summ. J. 16.)  The Court finds this
purported connection somewhat speculative.  However, the
unexpected, late-night, and forcible nature of the men's entry,
as well as the shots fired into the air upon the men's departure,

demonstrate a clear effort to intimidate or coerce.  Accordingly, the Court concludes that Calderon has established all of the requisite elements of torture, as defined under the TVPA, and GRANTS his motion for summary judgment as to this claim.

### 4.  Alvarado

Finally, Plaintiff Daniel Alvarado seeks summary judgment on his claim of torture under the ATCA and the TVPA.  The undisputed facts plainly reveal that Alvarado was subjected to severe pain and suffering by members of the Treasury Police, including electric shocks and beatings.  The facts also demonstrate that Alvarado was tortured until he agreed to sign a statement stating that he had murdered Lt. Cmdr. Albert Schaufelberger, a United States military adviser.  Finally, Defendant does not dispute that Major Ricardo Pozo, chief of the intelligence section of the Treasury Police and the lead investigator in Lt. Cmdr. Schaufelberger's death, was in charge of the men who tortured Alvarado.  (Def.'s Resp. Pls.' SOMF ¶¶ 64-75.)  The Court concludes that Alvarado has thus established governmental involvement, as well as the other elements of torture, under the TVPA and ATCA.  His motion for summary judgment as to this predicate act is GRANTED.

### C.  Extrajudicial Killing

The TVPA defines extrajudicial killing as:

> a deliberated killing not authorized by a previous
> judgment pronounced by a regularly constituted

-21-

> court affording all the judicial guarantees which
> are recognized as indispensable by civilized
> peoples.  Such term, however, does not include any
> such killing that, under international law, is
> lawfully carried out under the authority of a
> foreign nation.

28 U.S.C. § 1350 note § 3(a).  Courts rely on this definition to analyze claims of extrajudicial killing under the ATCA as well.  See Saravia, 348 F.Supp.2d at 1148, 1153-54.  To make out a claim for extrajudicial killing under both the TVPA and the ATCA, Plaintiffs must show that the killing was carried out under actual or apparent authority, or color of law, of any foreign nation.  See 28 U.S.C. § 1350 note § 2(a)("An individual who, under actual or apparent authority, or color of law, of any foreign nation . . . subjects an individual to extrajudicial killing shall . . . be liable . . . .");  H.R. Rep. No. 102-367(III), reprinted in 1992 U.S.C.C.A.N. at 87 (noting that suits against "purely private groups" are not actionable under the TVPA); Saravia, 348 F.Supp.2d at 1149-50 ("Under Section 2(a) of the TVPA, in order to make out a claim for extrajudicial killing, plaintiff must show that [Defendant] acted under actual or apparent authority, or color of law, of any foreign nation.  Courts have generally required this showing for extrajudicial killing claims under the ATC as well."); Kadic, 70 F.3d at 243-44 (holding summary execution actionable under the ATCA "only when committed by state officials or under color of law").

-22-

### 1. Chavez

Chavez seeks summary judgment on her claim that her parents were summarily executed by government-affiliated death squads. As set forth above, however, a triable issue of fact exists as to whether there was government involvement or substantial cooperation between private individuals and the government in her parents' deaths. See supra Part IV B.1. Accordingly, Chavez's motion for summary judgment on these claims, under both the TVPA and the ACTA, is DENIED.

### 2. Calderon

The undisputed facts surrounding the murder of Calderon's father demonstrate that all of the requirements for extrajudicial killing under the TVPA are met. Namely, Calderon observed men—carrying military-issued rifles and accompanied by members of the National Police—enter his home and deliberately execute his father without judicial process or for any apparent lawful reason. (Def.'s Resp. Pls.' SOMF ¶¶ 46-55.) As Defendant does not dispute Calderon's claim, there is no genuine issue of material fact on this predicate act. Accordingly, Calderon's motion for summary judgment as to his claim of extrajudicial killing under the TVPA is GRANTED.

### 3. Revelo

Revelo's claim that her husband, Manuel Franco, was summarily executed is not based on her personal knowledge, but

rather on the findings of the Truth Commission Report.  See supra n.2.  Accordingly, the Court must first determine whether the Report constitutes admissible evidence.  See Turner v. Scott, 119 F.3d 425, 430 (6th Cir. 1997)("summary judgment rulings must be based on admissible evidence"); Wiley v. United States, 20 F.3d 222, 226 (6th Cir. 1994)("hearsay evidence cannot be considered on a motion for summary judgment").

Federal Rule of Evidence 803(8)(C) provides an exception to the hearsay rule for "[r]ecords, reports, statements . . . of public offices or agencies, setting forth . . . factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness."  Fed. R. Evid. 803(8)(C).  The Rule creates a presumption of admissibility, which the opposing party has the burden to overcome by proving its untrustworthiness.  Bank of Lexington & Trust Co. v. Vining-Sparks Sec., Inc., 959 F.2d 606, 616 (6th Cir. 1992).

As a threshold matter, the Truth Commission Report must have been prepared by a "public office or agency" to fall under Rule 803(8)(C).  The Report was prepared by the United Nations Truth Commission on El Salvador, which was formally created by the April, 1991, Mexico Agreements between the Government of El Salvador and the Frente Farabundo Martí para la Liberación National ("FMLN").  The Mexico Agreements defined the functions

-24-

and powers of the Commission, which were expanded by the parties'
Peace Agreement in 1992. (Truth Comm'n Report at PL0017-18.)   It
is apparent that the United Nations Truth Commission on El
Salvador is a "public office or agency" under the meaning of Rule
803(8)(C).   See United States v. M'Biye, 655 F.2d 1240, 1242
(D.C. Cir. 1981)(finding that United Nations is a "public office
or agency" for Rule 803(10) purposes)("The U.N. is an
organization composed of nation members. It would defy reason to
suppose that such an organization, constituted of public entities
of the highest political order, would not itself be a public
agency.")

It is equally clear that the Truth Commission Report sets
forth "factual findings," and not merely a "recitation of
statements of other individuals . . . ." Miller v. Field, 35
F.3d 1088, 1092 (6th Cir. 1994)(holding investigative police
reports comprised of summaries of interviews with witnesses,
victim, and prosecutor that contained "neither factual findings
made by the report's preparers nor conclusions and opinions based
upon such factual findings" inadmissible under Rule 803(8)(C));
see also Combs v. Wilkinson, 315 F.3d 548, 555-56 (6th Cir.
2002)(rejecting argument that investigative report was not
admissible under Rule 602 or 803(8) for lack of authors' personal
knowledge because such reports "embody the results of
investigation and accordingly are often not the product of the

-25-

declarant's firsthand knowledge")(quotation omitted); <u>Hill v.
Marshall</u>, 962 F.2d 1209, 1215 n.2 (6th Cir. 1992)(admitting
report under Rule 803(8)(C) based on interviews with witnesses
where author did not have personal knowledge of events);
<u>Bridgeway Corp. v. Citibank</u>, 201 F.3d 134, 143 (2d Cir.
2000)(holding United States State Department Country Reports for
Liberia admissible under Fed. R. Evid. 803(8)(C) and noting the
rule "renders presumptively admissible not merely . . . factual
determinations in the narrow sense, but also . . . conclusions or
opinions that are based upon a factual investigation")(internal
quotations omitted).  Finally, it is evident, as set forth above,
that the Report's findings resulted "from an investigation made
pursuant to authority granted by law."  Fed. R. Evid. 803(8)(C);
(Truth Comm'n Report at PL0009)(noting Commissioners "were
entrusted with their task by the Secretary-General of the United
Nations").

Having concluded that the Truth Commission Report is
presumptively admissible, Defendant has the burden to prove that
the Truth Commission Report is not sufficiently trustworthy.  See
<u>Bank of Lexington & Trust Co.</u>, 959 F.2d at 616.  To determine
whether a report is trustworthy, the court considers four
factors: (1) the timeliness of the investigation, (2) the special
skill or experience of the investigators, (3) whether the agency
held a hearing, and (4) possible motivational problems.  <u>Id.</u>

Defendant's sole argument is that the Report is based on hearsay, not first-hand knowledge. (Def.'s Mem. Opp. Pls.' Mot. Summ. J. 4.) This recitation is insufficient to overcome the Report's presumptive admissibility, and it is clear that the Report satisfies each of the four indicators of trustworthiness.

First, the Report is based on an investigation that began in a timely fashion upon the signing of the Peace Agreement between the Salvadoran government and the FMLN. (Truth Comm'n Report at PL0009, PL0018)(noting work began on July 13, 1992, following signing of Peace Agreement in January). Second, the credentials of the Commissioners—a former president of Columbia; a congressman and former Minister of Foreign Affairs of Venezuela; and an international law professor in the United States and former president of the Inter-American Court of Human Rights—as well as their advisors, consultants, and researchers appear more than sufficient to satisfy the requirement that the investigators have special skill or experience. (See id. at PL0236-43.) The third factor under the trustworthiness inquiry is whether the agency held a hearing. While the Truth Commission did not hold formal hearings, it did conduct numerous interviews and examined thousands of complaints, court papers, and other documents. (Id. at PL0010.)

Finally, there is no evidence of "motivational problems" or bias in the Commission's methodology or conclusions. (See id. at

PL0025-26) ("[T]he Commission felt that it had a special
obligation to take all possible steps to ensure the reliability
of the evidence used to arrive at a finding.  In cases where it
had to identify specific individuals as having committed, ordered
or tolerated specific acts of violence it applied a stricter test
of reliability. . . .  In order to guarantee the reliability of
the evidence it gathered, the Commission insisted on verifying,
substantiating and reviewing all statements as to facts, checking
them against a large number of sources whose veracity had already
been established.")

As the Truth Commission Report exhibits all four indicators
of trustworthiness and Defendant has offered nothing to rebut its
admissibility, the Court finds that the Report is admissible
under Rule 803(8)(C) of the Federal Rules of Evidence.
Having determined that the Report is admissible, the Court now
turns to the sufficiency of Revelo's allegations of the
extrajudicial killing of her husband, Manuel Franco.

According to the Truth Commission report, Franco was a
leader of the Democratic Revolutionary Front ("FDR").  On
November 27, 1980, Franco and five other FDR leaders were
abducted by "one or more public security forces" from the Colegio
San Jose, in San Salvador.  Treasury Police provided the external
security operation, "which aided and abetted the perpetrators."
(Truth Comm'n Report at PL0068-69.)  Their bodies were later

-28-

dumped along the road outside of San Salvador. (Id. at PL0070.)
Revelo found her husband's body on the floor of a funeral home
and observed gunshot wounds to his mouth and thorax, as well as a
"very well-defined burn that surrounded his entire neck."
(Revelo Dep. at 31.)  The Court finds that there is no genuine
issue of material fact on Revelo's claim that her husband was
killed without judicial process by state actors.  Accordingly,
Revelo's motion for summary judgment as to her extrajudicial
killing claim under the ATCA and the TVPA is GRANTED.

## VI.  Conclusion

For all of the reasons set forth above, Plaintiff Chavez's
motion for summary judgment on her claims of torture and
extrajudicial killing under the ATCA and the TVPA, as predicate
acts under Plaintiffs' theory of command responsibility, is
DENIED.  Plaintiff Santos' motion for summary judgment on her
claim of torture under the TVPA, as a predicate act under
Plaintiffs' theory of command responsibility, is GRANTED.
Plaintiff Calderon's motion for summary judgment on his claims of
torture and extrajudicial killing under the TVPA, as predicate
acts under Plaintiffs' theory of command responsibility, is
GRANTED.  Plaintiff Revelo's motion for summary judgment on her
claim of extrajudicial killing under the TVPA and the ATCA, as
predicate acts under Plaintiffs' theory of command
responsibility, is GRANTED.  Plaintiff Alvarado's motion for

summary judgment on his claim of torture under the TVPA and the ACTA, as a predicate act under Plaintiffs' theory of command responsibility, is GRANTED.

So ORDERED this 25 day of October, 2005.

JON P. McCALLA
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 108 in
case 2:03-CV-02932 was distributed by fax, mail, or direct printing on
October 26, 2005 to the parties listed.

---

Nicolas Carranza
6530 Red Birch Dr.
Memphis, TN 38115

Robert M. Fargarson
NEELY GREEN FARGARSON BROOKE & SUMMERS
65 Union Ave.
Ste. 900
Memphis, TN 38103--054

David R. Esquivel
BASS BERRY & SIMS PLC
315 Deaderick Street
Ste. 2700
Nashville, TN 37238--000

Matthew J. Eisenbrandt
CENTER FOR JUSTICE & ACCOUNTABILITY
870 Market St.
Ste. 684
San Francisco, CA 94102

Carolyn Patty Blum
CENTER FOR JUSTICE & ACCOUNTABILITY
291 West 12th St.
New York, NY 10014

Honorable Jon McCalla
US DISTRICT COURT